EL PUEBLO DE PUERTO RICO, demandante y peticionario, *v.* DAVID CASTAÑÓN PÉREZ, acusado y recurrido.

*Número:* O-82-793          *Resuelto:* 30 de junio de 1983

*Miguel Pagán, Procurador General Interino,* y *Rose Mary Corchado Lorent, Procuradora General Auxiliar,* abogados de El Pueblo; *Luis A. Romero* y *Ramón A. Llobet,* abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

El Estado recurre en *certiorari* de la absolución perentoria en acusación por mutilación, decretada por la sala de instancia con fundamento en determinaciones de hecho de las que tomamos las relevantes[1] a esta decisión y que afirman:

---

[1] Sólo hemos prescindido de un párrafo y parte de otro (15 líneas).

El domingo 8 de agosto de 1982 entre las horas de las cuatro y treinta a las cinco pasado meridiano, el joven Abbot Kaufer Medina en unión a su primo Luis Rafael Vélez Medina y su amigo, Sergio Cima de Villa, se encontraban disfrutando de un día de playa, dentro del agua, aproximadamente unos 120–125 pies de la orilla, entiéndase por la orilla donde terminan las olas del mar, era un día soleado, el mar estaba normal, calmado en el sector de la playa de Isla Verde, jurisdicción de Carolina que se conoce por los amantes de los deportes acuáticos, como "Los Hobbie", por estar cerca del negocio que construyen [*sic*] los "hobbie cats", entre los Condominios Villas del Mar y el Girasol. Al poco rato de estar metidos dentro del agua y mientras se encontraban hablando, separados entre ellos como a unos diez (10) pies, Sergio Cima de Villa aparte, mirando hacia el Este y sus amigos Abbot y Luis de frente hacia él y sus espaldas hacia el Este vio aproximarse una lancha a velocidad en dirección de Este a Oeste, como a una distancia de treinta (30) a cuarenta (40) pies gritándole a Luis "cuidado que viene un bote", Luis miró hacia atrás, e inmediatamente se sumergió, pasando la lancha entre él y sus amigos, Abbot y Luis que estaban separados de él a la distancia ya indicada.

Que sintió el ruido del impacto con algo, que la lancha le pasó como a seis (6) pies de él, no nadó porque no tuvo tiempo, tampoco se sumergió, ni sufrió impacto o lesión alguna ocasionada por la lancha. Que posteriormente le preguntó a su amigo Luis, si estaba bien y éste le contestó que sí, se le preguntó a Abbot ¿estás bien?, ¿Te pasó algo? y Abbot no contestó, al ver que no contestaba nadaron hacia él y entonces se percató que había sangre alrededor del cuerpo de Abbot, que se estaba en ese momento sumergiendo.

Que con la ayuda de Luis Rafael Vélez Medina y otros bañistas que se acercaron lograron sacar a Abbot hasta la orilla y una vez en la arena, se percata que le falta el brazo izquierdo y tenía, además lesiones en la parte izquierda del cuerpo, botaba mucha sangre. Abbot es llevado a un hospital en un taxi que fue detenido por ellos.

Que había mucha gente en la playa dentro del agua había bastantes bañistas, sin señalar lugar específico, limitándose a indicar que el grupo de bañistas más próximo a ellos, estaba aproximadamente a unos veinticinco (25) pies de ellos. (Sobre este mismo extremo, o sea, el grupo de bañistas o bañista más

cercano a ellos, otro testigo, Luis Rafael Medina indicó que éste se encontraba como a cuarenta pies de ellos.)

Según la prueba presentada por el Ministerio Público el testigo Luis Rafael Vélez Medina, quien no puede identificar al acusado, como el operador de la lancha esa tarde del día 8 de agosto de 1982, calcula que dicha lancha iría a una velocidad de cincuenta (50) a cincuenticinco (55) millas por hora, comparando ésta con un carro. Que luego de dicha lancha impactarles, no se detiene para auxiliarlos, que continúa su rumbo hacia San Juan, haciendo un viraje hacia la izquierda y encaminándose nuevamente en dirección hacia el Este, o sea, hacia Boca de Cangrejos. La profundidad en ese sitio (donde ocurrió el accidente) conforme a la prueba presentada por el Fiscal es de seis (6) pies o poco más de seis (6) pies, ésta además, es al efecto de que mientras se retiraba del lugar del accidente el operador de la lancha miraba hacia atrás, que no iba persona alguna otra con el operador de la lancha, que al dejar de mirar éste aceleró la marcha, siguiendo rumbo a Boca de Cangrejos, donde posteriormente se localiza el bote, el cual es descrito como una lancha de 18 a 20 pies de eslora, marca Glastron, color gris y el aquí acusado se encontraba echándole agua con una manguera a dicha lancha en su parte posterior (popa) ya fuera del agua . . . .

La prueba del Ministerio Público que surge del testimonio de los testigos Orestes Pavía y Sergio Cima de Villa identifican en corte abierta al acusado David Castañón Pérez, como el operador de la lancha al momento del accidente, la cual no se detuvo para auxiliar a los heridos ni para suministrar sus datos personales a la parte o partes afectadas.

Igualmente se presentó prueba por el Ministerio Público a los efectos de que tampoco el acusado informó dicho accidente a la Autoridad de los Puertos como es su obligación conforme a la Ley (testimonio estipulado del Sr. Ricardo Correa Marcano, funcionario de la Autoridad de los Puertos).

El delito de mutilación está definido en el Art. 96 del Código Penal de 1974 (33 L.P.R.A. sec. 4033) así:

Toda persona que ilegal y maliciosamente privara a otra de un miembro de su cuerpo, o lo mutilare, desfigurare o inutilizare, o le cortare o mutilare la lengua, sacare un ojo, sajare la nariz, oreja o labio, desfigurase su rostro o alterare perma-

nentemente la apariencia de su rostro o inutilizare permanentemente su capacidad para oír, ver o hablar, será sancionada con pena de reclusión por un término fijo de nueve (9) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de quince (15) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de seis (6) años. El Tribunal podrá imponer la pena de restitución en adición a la pena de reclusión establecida, o ambas penas.

■ La definición de los términos "malicia" y "maliciosamente" en el Núm. 19 del Art. 7 del Código Penal, 33 L.P.R.A. sec. 3022(19), como que "[d]enotan la comisión de un acto dañoso, intencionalmente, sin justa causa o excusa y la consciente naturaleza del mismo", hay que leerla y entenderla bajo el criterio de formas de culpabilidad que el Art. 14 ordena así:

Nadie podrá ser sancionado por una acción u omisión que la ley provee como delito si la misma no se realiza con intención o negligencia criminal.

La intención o la negligencia se manifiestan por las circunstancias relacionadas con el delito, la capacidad mental y las manifestaciones y conducta de la persona. 33 L.P.R.A. sec. 3061.

■ La nueva disposición introduce la clasificación del delito como intencional o doloso; y el negligente o culposo, equivalente a la imprudencia temeraria. La ausencia de malicia constituye la nota esencial que caracteriza el delito culposo. A renglón seguido nuestro Código Penal particulariza y distingue entre el delito intencional (doloso) y el de negligencia (culposo) al declarar:

Art. 15. *Intencional*

El delito es intencional:

(a) Cuando el resultado ha sido previsto y querido por la persona como consecuencia de su acción u omisión; o

(b) Cuando el resultado sin ser querido ha sido previsto o pudo ser previsto por la persona como consecuencia natural o probable de su acción u omisión. 33 L.P.R.A. sec. 3062.

Art. 16. *Negligencia*

Responde por negligencia la persona que ha producido un resultado delictuoso sin quererlo, por imprudencia o descuido, o falta de circunspección o impericia o por inobservancia de la ley. 33 L.P.R.A. sec. 3063.

■ La ausencia de cualificación de intención y medios —presentes en el asesinato (Arts. 82 y 83 Código Penal)— en el delito de mutilación extirpa toda noción de ser éste uno en que ha de exigirse determinada intención específica. Ya hace muchos años y sin la ayuda de vía tan explícita como la provista en el moderno Código Penal, este Tribunal llegó a igual conclusión al sostener que "como el código no requiere para que el delito de mutilación se entienda cometido que se pruebe una intención específica, ya que toda persona responde de las consecuencias naturales de sus actos voluntarios y maliciosos, no es necesario que la acusación alegue tal intención de mutilar". Y en síntesis final que anticipó las señaladas modalidades de intención y negligencia, dijimos: "lo que tiene que probar el Fiscal, en casos como el presente [herida que seccionó cuatro dedos de la mano], es que el acusado privó a otra persona de un miembro de su cuerpo". *El Pueblo* v. *Pizarro*, 21 D.P.R. 17, 20, 23 (1914). [2]

Complementa el concepto de responsabilidad penal en el Código el reconocimiento de eximentes —llamadas causas de exclusión de responsabilidad— la primera de las cuales sería la única relacionable (mas no aplicable) con el caso que nos ocupa, el *caso fortuito* que el Art. 18 del Código identifica al reglar: "No incurre en responsabilidad la persona que, en ocasión de ejecutar un acto lícito, con la debida diligencia, o al incurrir en una omisión, causa daño por mero accidente, desgracia o casualidad, sin mediar intención ni negligencia."

---

[2] El texto penal así interpretado en 1914, que fue el Art. 212, Código Penal 1902, en cuanto concierne a su relevante parte introductoria, "[t]oda persona que ilegal y maliciosamente privare a algún ser humano de un miembro de su cuerpo . . ." coincide con el actual Art. 96.

■ El 20 enero, 1983 requerimos del acusado recurrido mostrar causa[3] por la que la prueba hasta ahora presentada en juicio y sobre la cual la sala de instancia concedió una absolución perentoria, no deba tomarse como evidencia prima facie del delito de mutilación a tenor de las normas de intención y negligencia de los Arts. 15 y 16 del Código Penal. Confrontado con el preciso y abarcador texto de dichas disposiciones penales, el acusado recurrido sólo ha podido oponer una solución que corresponde a la Asamblea Legislativa: que se limite la figura del delito de mutilación en el aspecto de intención, a la agresión o intento de agredir o de causar daño, y que la malicia podrá presumirse sólo si el daño se causó como consecuencia de un acto peligroso per se. La proposición es tan ambiciosa que exige modificación del principio básico de responsabilidad que caracteriza el Código como instrumento de protección social en los tiempos modernos de máximo desarrollo industrial, restringe los conceptos de delito intencional y negligente, y evade en el de mutilación el fin esencial de sancionar la atrocidad,[4] con abstracción del medio o instrumento usado en su comisión. En el delito culposo o de negligencia criminal del Art. 16

---

[3] La orden emitida dice así:

"Considerando que la prueba hasta ahora introducida en juicio por El Pueblo de Puerto Rico establece que el acusado incurrió en negligencia que (a) produjo un resultado delictuoso sin quererlo, por imprudencia o descuido, o falta de circunspección o impericia, o por inobservancia de la ley [Art. 16, Código Penal, 33 L.P.R.A. sec. 3063; y 23 L.P.R.A. sec. 451h(a)]; [o] (b) realizó un acto delictivo en circunstancias en que el resultado sin ser querido ha sido previsto o pudo ser por él previsto como consecuencia natural o probable de su acción u omisión [Art. 15, Código Penal, 33 L.P.R.A. sec. 3062]; y que el delito de mutilación no requiere más intención que la exteriorizada por la conducta antes descrita, el recurrido tendrá de término hasta el 4 febrero, 1983 para mostrar causa por la que no deba determinarse la existencia de prueba *prima facie* de mutilación, anular la resolución de *non suit* y devolver el caso a instancia para continuación del juicio."

[4] En su origen el delito de mutilación se consideró atrocidad contra la paz del rey, privado de la ayuda y auxilio del súbdito reducido en los medios de combatir, bien para defenderse, o atacar al enemigo. *State* v. *Bass*, 255 N.C. 42 (1961); 86 A.L.R.2d 259 (1961). Hoy día se protege la integridad de la persona, la natural suficiencia y buena apariencia de los miembros y órganos del cuerpo humano, y la preservación de sus funciones.

basado en que la persona ha producido un resultado delictuoso sin quererlo, por imprudencia, descuido, falta de circunspección, impericia o por inobservancia de la ley, se descartó después de extenso debate, la necesidad de hacerlo punible solamente cuando así se disponga con ulterior especificación por el Código o por ley especial.(5) La moderna estructuración de nuestro Derecho penal elaborado sobre el principio de que quien ejecuta un hecho criminal es responsable de todo el mal que por consecuencia del mismo se produce,(6) deja sentado que la ausencia de perfecta armonía entre la intención delictuosa y el resultado, en nada excluye la responsabilidad penal del agente a quien ha de alcanzar tanto la derivada del acto realizado, como de las consecuencias dimanadas del mismo.

El Art. 15(b) del Código considera intencional el delito cuando el resultado sin ser querido ha sido previsto, o pudo ser previsto por la persona como consecuencia natural o probable de su acción u omisión. La conjugación de intención y consecuencia restringe la connotación maliciosa que no va más allá, en la definición del término que hace el Art. 7, Apdo. 19 del Código, de un acto dañoso *intencional*, sin justa causa o excusa, presente en el actor consciencia de la naturaleza del mismo. Y a esa conclusión habíamos arribado desde *El Pueblo* v. *Pizarro*, supra, pág. 20, donde consideramos innecesario alegar en la acusación la "intención de mutilar". En California,(7) de donde procede el artículo

---

(5) Comentarios al Art. 16 en la edición del Departamento de Justicia, 36 Rev. C. Abo. P.R. 22 (1975), que recoge expresión del penalista López Rey y Arrojo en la que señala que "la tendencia general es la de reconocer una mayor responsabilidad penal por hechos cometidos por negligencia, impericia o inobservancia de deberes basada en las complejidades del mundo moderno evidenciadas en la creciente mecanización, industrialización, fabricación y pre-fabricación, producción en masa, creciente tecnología y mayor necesidad de expertos y especialistas, todo lo que significa mayor atención y cuidado respecto a la comunidad; exigencias y circunstancias que a tal grado no existían a mediados del Siglo 19".

(6) *Cf. Pueblo* v. *Calderón Laureano*, 113 D.P.R. 574 (1982).

(7) El Código de California define mutilación así: "Every person who unlaw-

original en nuestro Código, el término "maliciosamente" en la definición de mutilación no implica determinación ni premeditación, y basta que la prueba establezca un acto del cual la ley inferirá que se actuó ilegal y maliciosamente, a menos que haya evidencia demostrativa de eximente. *People* v. *Nunes*, 190 P. 486 (1920); 47 Cal. App. 346, 349. Toda la intención exigida es la que pueda inferirse de la naturaleza de las lesiones resultantes de ciertos actos intencionales. *Goodman* v. *Superior Court of Alameda County*, 148 Cal. Rptr. 799 (1978); 84 Cal. App. 3d 621. Bajo la premisa de que la conducta ilegal intencional comprende malicia, la Corte Suprema de Carolina del Norte confirmó la sentencia por mutilación impuesta a un médico que en ausencia del autor físico anestesió los dedos sobre los que la víctima había concertado el cercenamiento con un tercero, para cobrar dinero de seguro. *State* v. *Bass*, 255 N.C. 42 (1961); 120 S.E.2d 580.

■ La malicia deliberada no es elemento esencial del delito de mutilación, por lo que no exige prueba de premeditación o deliberación. *People* v. *Wright*, 93 Cal. 564, 566 (1892). En *Pueblo* v. *Cordero*, 82 D.P.R. 379, 382 (1961), citamos con aprobación a *People* v. *Wright*, y *Pueblo* v. *Pizarro*, supra, en su aseveración de que el delito de mutilación no exige prueba de intención específica, ni de premeditación porque "de todas formas, tal maliia puede deducirse de la conducta del acusado y las circunstancias que rodean la comisión del delito . . . ya que para estos fines malicia es sinónimo del propósito o designio de causar daño. La malicia queda establecida con prueba de la comisión del acto . . . . Uno de los objetivos del legislador al definir este delito fue evitar la brutalidad alarmante . . . y de ahí que se presuma la malicia de la atrocidad del acto en sí, que entre otros casos se deduce de la naturaleza del instrumento o

fully and maliciously deprives a human being of a member of his body. . . ." Cal. Penal Code Sec. 203 (West 1970).

medio utilizado para la agresión". El Tribunal Supremo de los Estados Unidos hizo una incursión en este campo del orden de responsabilidad que incluye propósito, conocimiento, imprudencia, y negligencia para concluir que hallándose la administración del sistema federal de justicia confiada a simples mortales, bien sean abogados, jueces o jurados, el sistema podría desplomarse por su propio peso si las cortes o los eruditos se obsesionan con distinciones rebuscadas (*hairsplitting*), sean tradicionales o noveles, que el Congreso (léase Asamblea Legislativa) ni expresó ni implicó cuando definió la conducta criminal. *United States* v. *Bailey*, 444 U.S. 394, 406 (1980). Cuello Calón es también del criterio que la voz "maliciosamente" como la de "a sabiendas" y "con propósito" y otras que denotan la voluntad dolosa del agente constituyen "redundancias completamente superfluas" y que esas expresiones se han empleado para denotar su ejecución meramente intencional (con aquella intención común u ordinaria). E. Cuello Calón, *Derecho Penal*, 17ma ed., Barcelona, Ed. Bosch, 1975, T. 1, Vol. 1, págs. 437–438.

◼ La prueba presentada por el Estado en el caso de autos señala al recurrido conductor de la lancha operándola a marcha veloz en una playa concurrida por bañistas, en zona llana de baño, de solo 6 pies de hondura. Ocurrido el encuentro de lancha y bañista que tuvo como consecuencia la pérdida por cercenamiento del brazo izquierdo de Kaufer Medina, surge la figura prima facie de delito intencional de mutilación que define el Art. 15(b) del Código Penal: un resultado que sin ser querido pudo ser previsto por el recurrido piloto como consecuencia natural y probable de su acción. La previsibilidad del grave daño al bañista inducida por la consciencia del riesgo que conlleva navegar a 50 m.p.h. en zona de sólo 6 pies de profundidad donde había numerosas personas en el agua, en nuestro medio debe ser además preocupación constante de los deportistas de lancha por las frecuentes protestas públicas de bañistas contra la penetración de embarcaciones al agua llana que es propia-

mente zona de baño y natación. La forma y lugar en que el recurrido conducía su lancha, según las determinaciones del juzgador, constituía no solo base de previsibilidad del accidente catastrófico, y sí además, conducta de alta peligrosidad, notoria y repudiada en nuestros balnearios. La regla de *El Pueblo* v. *Astacio*, 23 D.P.R. 842 (1916), que le exigió al ciclista que corría a velocidad por las calles de Cabo Rojo previsibilidad de que iba a atropellar a alguien, como efectivamente arrolló una niña por lo que fue convicto de acometimiento y agresión, tiene mayor vigencia hoy, pasado medio siglo. El acusado recurrido, que no transitaba en bicicleta por aquella calle de pueblo usualmente desierta, sino que atravesaba veloz en su lancha entre cabezas y torsos de bañistas agrupados en una playa concurrida "crea un peligro . . . [y] no puede negar que tuvo la intención de producir daño corporal a cualquiera de aquéllos, aunque no la tuviera para una persona determinada". *Astacio*, supra, pág. 845. "El deber de atención y diligencia . . . exigible a todos en la ejecución de los actos de la vida, aparece cada día más imperioso merced a las condiciones de la vida moderna que pone en manos del hombre formidables fuerzas mecánicas cuyo manejo imprudente o negligente ocasiona gravísimos males, por esto la infracción de aquel deber exige una severa sanción." Cuello Calón, *op. cit.*, pág. 457.

Apreciamos la honestidad intelectual del juez de instancia llevado a una conclusión errónea en un amargo caso, sin el beneficio de interpretación que ahora provee este Tribunal, sobre una cuestión que ha exigido una profundidad de examen para lo cual sabemos que no tuvo tiempo ni medios el ilustre magistrado dentro de la presión continua del calendario criminal.

Con estos antecedentes y fundamentos, *se expide el auto y se anula la absolución perentoria en el cargo de mutilación. Se devolverá el caso a instancia para continuación de procedimientos compatibles con lo aquí resuelto.*

Los Jueces Asociados Señores Dávila e Irizarry Yunqué se unen a la opinión del Tribunal y además emiten votos separados. El Juez Asociado Señor Negrón García concurre en el resultado sin opinión. El Juez Asociado Señor Rebollo López concurre en el resultado y se reserva el derecho de emitir un voto separado.

—O—

Voto separado del Juez Asociado Señor Dávila.

Me he unido a la opinión del Tribunal pero creo procedente hacer constar que aun bajo la tesis propugnada por el recurrido, de limitar "la figura del delito de mutilación en el aspecto de intención, a la agresión o intento de agreder [*sic*] o de causar daño, y que la malicia podía presumirse solo si el daño se causa como consecuencia de un acto peligroso *per se*", de establecerse los hechos que se le imputan, estaría incurso en el delito de mutilación ya que el daño causado lo fue "como consecuencia de un acto peligroso *per se*": conducir una lancha con motor fuera de borda, a alta velocidad, cerca de la orilla donde disfrutan del baño un grupo de personas. *Cf. El Pueblo* v. *Astacio*, 23 D.P.R. 842 (1916).

—O—

Voto separado del Juez Asociado Señor Irizarry Yunqué.

Concurro y uno mi voto a la opinión del Tribunal por considerarla correcta en su apreciación del Derecho y por estar limitada a reconocer que en este caso la prueba aducida, considerada frente a una moción de absolución perentoria bajo la Regla 135 de Procedimiento Criminal, es suficiente para establecer un caso prima facie contra el imputado. La opinión no pasa juicio, ni podría hacerlo, sobre aspectos de credibilidad ni sobre la suficiencia de la prueba ante el requerimiento constitucional de que la culpabilidad se pruebe más allá de duda razonable. Esto compete al juzgador de los hechos.

El Código Penal vigente es un cuerpo sistematizado armónicamente, que se adoptó en 1974 para sustituir al obsoleto Código de 1902, corrigiendo a su vez numerosas fallas de que éste adolecía. Véase el informe en torno al Proyecto del Senado 753, que se convirtió en la ley que adoptó el vigente Código Penal. 33 L.P.R.A. sec. 3001 (anotación).

Bajo este esquema legislativo no puede concebirse que la "imprudencia crasa o temeraria" que se define en el Art. 87 (33 L.P.R.A. sec. 4006) sea equivalente a la malicia que requiere el delito de mutilación definido en su Art. 96 (33 L.P.R.A. sec. 4033). Me explico.

El Art. 87 dispone:

Cuando en la muerte ocasionada por una persona al conducir un vehículo de motor mediare imprudencia crasa o temeraria, se impondrá pena de reclusión por un término fijo de tres (3) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de cinco (5) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de dos (2) años.

La imprudencia crasa o temeraria es aquella de tal naturaleza que demuestre un absoluto menosprecio de la seguridad de los demás bajo circunstancias que probablemente produzcan daños a éstos y no significa una mera falta de cuidado.

El Art. 96 dispone:

Toda persona que ilegal y maliciosamente privara a otra de un miembro de su cuerpo, o lo mutilare, desfigurare o inutilizare, o le cortare o mutilare la lengua, sacare un ojo, sajare la nariz, oreja, labio, desfigurase su rostro o alterare permanentemente la apariencia de su rostro o inutilizare permanentemente su capacidad para oír, ver o hablar, será sancionada con pena de reclusión por un término fijo de nueve (9) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de quince (15) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de seis (6) años. El tribunal podrá imponer la

pena de restitución en adición a la pena de reclusión establecida, o ambas penas.

Como puede verse de la lectura de ambos textos, causar la muerte de una persona al conducir un vehículo de motor, mediand "imprudencia crasa o temeraria", y privar a una persona de un miembro de su cuerpo de manera "ilegal y maliciosamente" son ambos delitos graves, pero el legislador concibe que el segundo es más grave que el primero pues, mientras establece una pena de tres años de prisión para el primero, señala una pena tres veces mayor —nueve años de prisión— para el segundo. Nadie concebiría que, tomado en abstracto, privar a una persona de un miembro de su cuerpo sea más grave desde el punto de vista del Código Penal que privarla de la vida. El derecho a la vida es uno de los derechos fundamentales reconocidos por nuestra Constitución. Carta de Derechos, Art. II, Sec. 7.

La única explicación que puede justificar la diferencia en las penas establecidas para estos delitos la hallamos en la forma como se cometen. Para el homicidio tipificado en el Art. 87 se requiere "imprudencia crasa o temeraria". Para el delito de mutilación se requiere que el imputado actúe "ilegal y maliciosamente". Obviamente, "imprudencia crasa o temeraria" y "malicia" no son sinónimos. Así, quien lance un vehículo de motor contra un grupo de personas "ilegal y maliciosamente" y con dicho acto cause la muerte de una de dichas personas comete el delito de asesinato tipificado en el Art. 82 (33 L.P.R.A. sec. 4001).([1]) Si con dicho acto priva a una de dichas personas de un miembro de su cuerpo, comete mutilación.([2])

Al acusado en el caso ante nuestra consideración se le imputa que "ilegal, voluntaria, maliciosa y criminalmente,

---

([1]) Dice: "Asesinato es dar muerte a un ser humano con malicia premeditada."

([2]) Los términos "malicia o maliciosamente" son definidos en el Código, Art. 7 (33 L.P.R.A. sec. 3022) inciso 19, como que "[d]enotan la comisión de un acto dañoso, intencionalmente, sin justa causa o excusa y la consciente naturaleza del mismo".

privó permanentemente de un miembro del cuerpo al ser humano Abbot Kaufer Medina cuando en ocasión en que operaba una lancha de motor en la playa de Isla Verde impactó [*sic*] con su lancha a dicho joven desprendiéndole con la hélice de su motor su brazo izquierdo". Luego del desfile de la prueba presentada por el fiscal para establecer lo alegado en esta acusación, el imputado solicitó del tribunal y éste decretó su absolución perentoria bajo la Regla 135 de Procedimiento Criminal.

La citada Regla 135 dispone que el tribunal "a instancia propia o a instancia de un acusado decretará su absolución perentoria en uno o varios cargos de la acusación o denuncia luego de practicada la prueba de una o de ambas partes si la misma fuere insuficiente para sostener una convicción por ese cargo o cargos".

En el caso ante nuestra consideración ha desfilado únicamente la prueba de cargo. Su suficiencia ha de determinarse desde el punto de vista de si considerada en conjunto y tomando en cuenta las inferencias que la misma permita, y considerada a su vez desde el punto de vista más favorable a la acusación, de ser cierta, establecería cumplidamente todos los elementos esenciales del delito imputado. Véase, sobre el particular, 2 Wright, *Federal Practice and Procedure: Criminal 2d* Secs. 462 y 467 (1982), en que se cita abundante jurisprudencia interpretativa de la Regla 29 de Procedimiento Criminal federal, equivalente a la 135 nuestra. De particular relevancia es el siguiente comentario en la Sec. 467:

> A number of familiar rules circumscribe the court in determining whether the evidence is sufficient to meet this test. It is not for the court to assess the credibility of witnesses, weigh the evidence, or draw inferences of fact from the evidence. These are functions of the jury. The court must look to all of the evidence, but must take the view of the evidence and the inferences therefrom most favorable to the government. That the testimony is in conflict is not in itself enough to require judgment of acquittal. (Escolios omitidos.) Págs. 663–665.

La prueba aquí aducida está recogida en la opinión del Tribunal, y no es menester reproducirla una vez más. Señala al imputado como la persona que conducía una lancha de motor a mucha velocidad, por aguas llanas cercanas a la orilla de la playa, en que había numerosos bañistas, y con la hélice del motor le arrancó un brazo a uno de los bañistas, hecho lo cual se alejó del lugar a gran velocidad.

La intención de cometer un acto dañoso, sin justa causa o excusa y la consciente naturaleza del mismo, son factores subjetivos que el Código Penal requiere y señala taxativamente para configurar el elemento "malicia o maliciosamente". Art. 7, inciso 19, antes citado. Por ser factores subjetivos, tienen que inferirse de la totalidad de las circunstancias. Frente a una moción de absolución perentoria, como la aquí propuesta, esas circunstancias han de tomarse del modo más favorable a la acusación y por ello en este caso dicha moción no debió prosperar.

No obstante lo expresado, procede señalar que una cosa es resolver sobre la suficiencia de la prueba frente a una moción bajo la Regla 135 y otra cosa aquilatar la totalidad de la prueba luego de sometido el caso por ambas partes, para que se decida sobre la inocencia o culpabilidad del acusado. En el segundo supuesto el enfoque es distinto. Para hallar culpable al acusado, la prueba deberá satisfacer la consciencia del juzgador más allá de duda razonable. Sobre eso no podemos pasar nosotros; la potestad sobre ello es exclusiva del juzgador de los hechos.

Concurro en que se devuelva el caso a instancia para ulteriores procedimientos.